All right, and you've already tested. Judge Ho is participating via Zoom. Everything's fine. All right. Well, in the first case on today's docket is cause number 20-20623, consolidated with cause number 21-20126. Is the appellant ready to proceed? Yes, Your Honor. Appellee ready to proceed? Yes, Your Honor. All right. And that's Mr. Barta? Correct, Your Honor. You may proceed. Good morning, and may it please the Court. James Barta for the Federal Energy Regulatory Commission. No one here disputes that Ultram— Speak up just a bit. Yeah, because I'm not hearing you. No one here disputes that Ultra may reject its private contractual commitments to RECS, but the Bankruptcy Court overstepped when it ruled that the consequence of rejection was to relieve Ultra of public regulatory duties imposed by tariffs filed with the Commission. That ruling conflicts with the governing statutory provisions and precedent in, I think, at least three ways. First, it can't be reconciled with Supreme Court precedent establishing that federal tariffs, like federal statutes and regulations, create binding regulatory duties that survive a contractual breach. Second, it can't be reconciled with the Supreme Court's recent holding admission that rejection has the same consequences as a breach outside of bankruptcy, in that it relieves the debtor of contractual obligations but does not relieve the debtor of regulatory burdens. And third, it can't be reconciled with Section 1129A6 of the Bankruptcy Code, which expressly requires the Commission to approve any changes to the rates embodied in a federal tariff. This morning, I would like to start by addressing those conflicts before turning to why this consequences of rejection do not warrant a different conclusion. Starting with the nature of tariffs, case law is clear that federal tariffs give rise to distinct regulatory obligations that cannot be escaped by breaching a private contract. As this Court recognized decades ago, federal tariffs are not mere contracts. They are the law. They have the same status as a federal statute or a federal regulation. Tariffs filed with the Commission, as a result, cannot, can be modified only with Commission approval. As ULTRA concedes at page 6 of its brief, parties have no power to change tariffs unilaterally. Nor for that matter may they deviate from tariffs without Commission approval. The rule is... Is the breach of a contract an abridgment of the tariff? In this case, yes, Your Honor. When the tariff and the contract... I'm not talking about this case. I'm just saying I breach a contract that is subject to a FERC rate. I just simply don't perform. Is that categorically an abridgment of the tariff? That, yes, Your Honor, that would be a deviation from the tariff unless there were provisions of the contract that fell outside the Commission's jurisdiction. And I think, you know, the rule that has been established is that when you have a tariff provision, the seller must collect the rate named in the tariff, and the buyer must pay that rate. If they don't... So would that mean that FERC would have jurisdiction over every contract case involving the transaction of natural gas? In other words, cases that I would normally assume would go to state court or a federal court of diversity. I'm not talking about bankruptcy at all here. I'm just talking about generic breach of contract. FERC is now going to be quite busy with those cases? The Commission has jurisdiction in cases that implicate tariffs subject to its jurisdiction, but it does not always assert that jurisdiction. As Section 20 of the Natural Gas Act recognizes, the Commission has discretion as to whether to bring an action to enforce the tariff in any individual case. And the Commission, in its ARCLA decision, laid out three factors that it considers in deciding whether to bring an enforcement action. And those factors include considerations like, does this case implicate issues that are important to the Commission's regulatory responsibilities? Does it implicate considerations that fall within the Commission's special expertise? But I... Has FERC ever tried to assert jurisdiction over a breach of contract case? The Commission regularly hears cases in which there has been an alleged breach of contract and also a breach of the federal tariff. And I think the Supreme Court's ARCLA decision... What do you mean... I'm sorry, but pardon my ignorance. What do you mean a case that has a breach of contract and a breach of the tariff? Yes, Your Honor. So the tariffs can arise in several different ways. One is by filing a contract with the Commission. Other times they arise by filing a unilateral rate sheet with the Commission. And when you have a contract that gives rise... That's filed with the Commission and gives rise to a tariff, that creates two distinct sets of obligations. It creates contract obligations, which parties can seek to enforce in court, and it also creates tariff obligations that the Commission can enforce. And the situation I think Your Honor is getting at is that because there are these two overlapping sets of obligations, outside of bankruptcy, you can have parallel enforcement actions, private enforcement actions for breach of contract, and Commission enforcement actions under the tariff itself. And those two will oftentimes be pulling towards the same goal, but they arise under different authorities. And I think the Supreme Court... So is the idea that a breach of a tariff would be a contract where the parties agree to apply a price that violates FERC? I'm sorry, Your Honor. I did not catch part of your question. Yeah, I apologize for not being there due to weather. When you say a breach of a tariff, are you talking about a situation where the contracting parties agree to a price that violates the FERC price? So that is one example of a breach of a tariff. A breach of a tariff can also occur when parties' conduct no longer matches what is in the tariff. And that is why there are cases sort of laying out the rule that parties cannot deviate from a tariff without Commission approval. It's not... I take it your answer implicit is FERC has not asserted jurisdiction over just a pure breach of contract situation. That's correct. And so in this case, is it just essentially a failure to perform under the contract, or are you separately saying there was some direct offense to the tariff itself? There is both, Your Honor. The contract, to the extent there's a rejection as a contractual breach, and that is something over which the Bankruptcy Court has sole jurisdiction, and the Commission has acknowledged that in its orders. But when Ultras stopped performing under the tariff, and its conduct no longer matched what was required by the tariff, that was a breach of the tariff, and the Commission has authority to enforce the tariff if it deems appropriate. And I think the Supreme Court's decision in Penn-Water makes that particularly clear. In Penn-Water, the parties had a contract that was filed with the Commission that gave rise to tariff responsibilities. In a separate private action, courts declared that the contract was no longer enforceable because it was illegal under antitrust laws. But the Supreme Court recognized that the Commission could still issue an order enforcing the tariff and requiring Penn-Water to comply with the tariff on file. And the Supreme Court explained that was because Penn-Water's duty to comply with the tariff sprang from the Commission's regulatory authority under the Federal Power Act, not the law of private contracts. And at the very conclusion of that decision, on pages 523 and 524, the Supreme Court emphasized that if Penn-Water wished to discontinue providing services that it rendered under the contract filed with the Commission, it would need to follow the statutory procedures outlined in the Federal Power Act to change its responsibilities by making the appropriate filing with the Commission. And that same principle applies in this case. Mission establishes that the breach, that rejection of a contract in bankruptcy has the same consequences as a breach outside of bankruptcy. It affects only contractual obligations. It does not grant a debtor an exemption from regulatory duties such as those imposed by the tariff. So in this case, if ULTRA wishes to change its separate and distinct regulatory obligations under the tariff filed with the Commission, it would need to make an appropriate filing under Sections 4 or 5 of the Natural Gas Act, just as the Commission does. Pardon my ignorance, what is the tariff violation at issue in this case? I'm not sure I've heard that yet. One aspect of the tariff obligation is the obligation to pay the amount specified in the tariff. And I think that's about $169 million over the course of several years. And that's the tariff obligation that ULTRA has, you know, is seeking to escape in this case. In other cases, you know, the tariff obligation may be different. It may be actually an obligation to provide service, to, you know, provide electricity, to ship gas. But in this case, we're talking about a payment obligation. But are you saying that there was a failure to pay at the FERC rate or just simply non-performance? There is a ULTRA seeks or sought a ruling from the Court that it would no longer need to comply with the tariff. It would no longer need to pay the amount specified in the tariff. Because I understand it's because they — sorry, please. It's not performing anymore. That's correct. That's their position, right? That's correct. Their position is that even though the tariff would require them to continue making payments for the next several years, they no longer need to do that. And that mismatch between what the tariff requires and what ULTRA is seeking to do constitutes a breach of the tariff. And it's something that the Commission has authority to enforce under Section 20 of the Natural Gas Act. And I think that's the crux of this case, is that recognizing that, yes, rejection is a tool for escaping private contractual commitments, but it does not grant debtors an exemption from complying with generally applicable laws, whether we're talking about environmental laws, health and safety laws, or in this case, the Natural Gas Act, which imposes tariff obligations on parties that are distinct from their contract obligations. So what does FERC want to have happen here? In a perfect world, from FERC's standpoint, what do they want? The — Do they want them to pay? Is that it? The Commission's focus is not on — is on compliance with the tariff. If ULTRA believes that it is no longer just and reasonable to comply with the tariff, it can make a filing with the Commission seeking relief from the tariff, and the Commission, as it has stated in its orders, stands ready to modify the tariff if that is in the public interest. How long does that take? That's the crux of this thing, isn't it? Your Honor, I think those — it can happen very swiftly. I think in the ANR pipeline decision, which is cited in our brief, it took about 35 days from the filing of a request to modify the tariff to the Commission — for the Commission to rule on it. That's about a third of the time it took the bankruptcy here — court here to go from considering a request to reject the contract to actually making a ruling on rejection. And if this process needs to happen faster, that is something that parties can certainly ask the Commission to do. And turning briefly to Mission — or, sorry, this Court's decision in Merrant, you know, I think Merrant is best understood as having a fairly limited holding that parties can reject Commission jurisdictional contracts in bankruptcy. It should not be read more broadly to dictate the consequences of rejection, both because no contract was ever rejected there, and reading it more broadly would bring it into conflict with the Supreme Court's intervening decision in Mission, in Penn-Water. As mentioned earlier, Mission makes very clear that rejection only gives relief from contract obligations, not tariff obligations. And when you read that with Penn-Water, it — you know, Penn-Water establishes that tariffs create those separate regulatory obligations. So when you put the two together, I think it's quite clear that rejection does not grant relief from those separate tariff obligations. I want to make sure I understand. You say rejection grants relief from contract obligations? That's correct, Your Honor. Not tariff obligations? That's correct. Yes. So what's the contract here about, though? Isn't it about the tariff? The contract is about the transportation of natural gas, and by virtue of filing with the Commission, became a tariff. And the tariff sort of once created has an independent regulatory existence that, as Penn-Water illustrates, cannot be, you know, extinguished by setting aside the contract, having it declared unenforceable, having it declared illegal, or simply by breaching it. Tariffs aren't mere parchment barriers. They have, you know, binding regulatory force that can be only changed when the Commission deems it's in the public interest. But it grows out of the contract in this case, the tariff. That's correct. It can — it grew out of the contract. So you can reject the contract, but not the tariff. That's correct, Your Honor. That's the subject of the contract. That's correct, Your Honor. I see my time has expired. If there's no further questions, I will reserve the remainder of the rebuttal. Thank you, Counsel. Mr. Hicks. Thank you, Your Honor, and may it please the Court, George Hicks for the appellee, Ultra Resources. In In Re Merit Corporation, this Court held that bankruptcy courts have authority to reject that vital right to rejection, quote, a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating a debtor's rejection by requiring continued performance at the pre-rejection filed rate. Subsequently, FERC pledged to abide by Merit, all of Merit, and it did so for 15 years. Now, however, FERC contends that even though a debtor in bankruptcy can reject a filed rate contract, the debtor must continue to perform under that rejected contract absent separate FERC approval, but FERC's newfound theory squarely conflicts with Merit. As a result, FERC is forced to claim for the first time ever that the section of Merit foreclosing this argument is dicta. That assertion not only contradicts FERC's repeated, unqualified admissions that Merit is controlling, but it is patently incorrect. But this issue was thoroughly briefed and extensively addressed in Merit, and the Court's analysis was necessary to its decision and constituted an explication of the law regarding rejection of filed rate contracts. But aside from being controlling, Merit is plainly correct. As this Court explained, because some injunctive relief is necessary to bring finality to a under a rejected filed rate contract. Otherwise, rejection would be meaningless. The Sixth Circuit recently reached the same conclusion, and no court has held otherwise, and for good reason. FERC's argument relies on a misreading of the filed rate doctrine that would wreak havoc on the bankruptcy process, not least by affording counterparties to such contracts, effectively super priority over all other unsecured creditors in blatant violation of the absolute priority scheme. As a fallback, FERC argues that it has to make its own public interest determination before a court can authorize rejection. But this Court held in Merit that it is, quote, the courts who should assess the impact of rejection upon the public interest, with FERC assisting the court in balancing the equities by participating in the proceedings as a party in interest. That is exactly what happened here. FERC's argument is, again, contrary to Merit and would upend the Chapter 11 process, especially in large-scale, complex restructurings where certainty and swiftness are paramount. Merit also forecloses FERC's final argument, that ULTRA had to obtain FERC's approval for planned confirmation. Regulatory approval is required only when there is a rate change, and Merit holds that this does not result in a change to the filed rate. In short, as FERC has repeatedly admitted, without qualification, Merit controls this case and it forecloses FERC's theories across the board. The judgment should be affirmed. Now, I'd like to talk first a little bit about the binding aspect of Merit as a holding across the board, and then I do want to address some of my friend's arguments on the Merit, which is FERC's admissions to the contrary. I believe that FERC really only makes one argument as to why this particular section, and it is an entire section of Merit, six paragraphs long, is not dicta, and that is that, ultimately, there was not a contract that was rejected in that case. But of course, this Court routinely opines on the authority of lower courts or agencies or bankruptcy courts to do or not do something and what it can do and what it can't do, and the mere fact that on remand the court or the bankruptcy court or the agency might not exercise that authority or might come to one decision or the other on the Merit doesn't make this Court's decision dicta. Now, if FERC's argument were correct, the entire decision of Merit would be dicta because, of course, there was no contract ultimately rejected there, and so even the holding that FERC concedes is a holding about rejection would be dicta. But of course, FERC doesn't argue that because I think its argument proves too much. And of course, this issue was extensively addressed and briefed in the briefs. So if you look back at the Merit briefs, this is the opening brief at page 44 in Merit. Rejection and an injunction to protect the ruling were proper, and it goes on. And then in FERC's response brief, Merit's rejection motion seeks to eliminate its obligation to continue to pay the filed rate approved by FERC. It goes on. The power to authorize rejection under 365 did not give the bankruptcy court authority to stay FERC. And so this was clearly addressed in Merit, in the briefing, and it was addressed in the holding. And I think that's why you see other courts treating it as a holding as well. The Sixth Circuit certainly did, and I also want to give you a recent First Circuit case that treated this particular aspect of the Merit decision as a holding. This is one of the Puerto Rico oversight cases from the First Circuit, specifically the Campamento case at 9 Fedforth 1. And it's discussing why did Merit establish a heightened standard for the authorization of rejection of filed rate contracts, and it says, part of what drove the result in Merit was that FERC lacked authority to take independent action to enforce the federal laws implicated by the rejection motion. And that makes perfect sense, because that's the reason why there was a heightened public interest standard, which FERC doesn't challenge in this case. It's because FERC can't require specific performance. And on that point, I do want to maybe pull back to the Merit's a little bit, which as I heard my friend refer several times, and it was respectfully a little vague, regarding what FERC's authority is when it comes to a contract or a breach of contract or the filed rate doctrine. And I want to be very clear. Section 7B of the Natural Gas Act, which I believe is 15 U.S.C. 717F parentheses B, it is about pipelines. Congress gave FERC the specific statutory authority to compel specific performance under filed rate contracts by pipelines. There is nothing else in the Natural Gas Act that speaks to that authority to compel specific performance, which has — What does that come down to, though? I mean, in practical terms — What? What? You've got to put gas through the line or what? I mean, what is that — Well, Your Honor, I think the reason why that — that particular statutory authority is there is because of Congress's recognition that pipelines have — you know, it reflects a need to, you know, keep the gas moving or keep the electricity moving in the power sense or something like that. But that doesn't apply to producers or shippers. And FERC's only response — and so I think you can — under customary canons of statutory interpretation, there's two important takeaways from that statutory authority given to FERC to compel specific performance by pipelines. Number one, it establishes that there isn't some sort of general free-floating FERC authority to compel specific performance simply because there was a filed rate contract. And number two, because there was specific congressional authority given. But number two, there is no such authority when it comes to producers or shippers, only pipelines. And so there really is no case or statute that stands for what FERC is ultimately arguing here, which is that when there is a filed rate contract, that a party must comply with it rather than breaching and paying damages. And that's the key point here. There really is no case, no statute that stands for that. In fact, Section 7B strongly implies the contrary. And FERC really has no response to Section 7B. I think in its reply brief at page 13, it simply says, well, that doesn't mean that FERC couldn't have the authority to compel specific performance of producers or shippers. Well, actually, under canons of statutory interpretation, that is what you take away from that specific congressional authority that was granted to FERC with respect to pipelines. And now, so what does FERC try to come up with to sort of create that duty? Well, they look to the two cases, Penwater and Mission Product. And with respect, when you read these decisions, they do not stand for the new proposition that FERC is trying to create. And I think that's particularly why FERC didn't even cite Penwater in its mirrored briefing. So Penwater, it was not a bankruptcy case. It did not involve rejection of a filed rate contract. All that happened there was the party sought to modify, not breach, modify its rate by quote nullifying a rate reduction order that the commission had entered. And the court didn't actually address the question that FERC keeps saying that it addressed and resolved. It said we will not, we do not decide quote what if any power the commission has to compel parties to carry out private contracts which would otherwise be illegal. And so FERC, the Supreme Court said that simply because it recognized this has nothing to do with the private contract over here. This is all about an order that the FPC issued and the party there was simply trying to nullify it by modifying the rate. That is very different from breaching and paying damages by not performing which is what's happening in rejection. And again, FERC doesn't challenge the idea that FERC jurisdictional contracts can be rejected in bankruptcy. So there's nothing in Penwater that suggests that a debtor must keep performing under a rejected filed rate contract rather than breaching or rejecting and paying damages based on the filed rate. And so then they look to mission product. Well mission product, I mean for the most part it talks a whole lot about how rejection relieves a party of its obligations. It says rejection quote means repudiating any further performance of its duties. So what FERC does is it latches onto one sentence in mission product  that generally applicable law imposes. Well there's a couple problems with that. The first is that that only begs the question of what burdens generally applicable law imposes. And as I've talked about here, there is no generally applicable law that requires a debtor to keep performing under a rejected filed rate contract rather than breaching and rejecting. And that's why at that point FERC goes back to Penwater to try to fill that gap. But as I've explained, Penwater doesn't do that, which again is why they didn't cite it in Mirren. But the other problem with mission product is that the court's reference to generally applicable law in that case was all about a trademark license because the particular contract in that case wasn't just performance on both sides, like you would have in a typical executory contract or you have in this case. There was also the granting of a property right, a trademark license. And the case was all about whether the breach and payment of damages, including at the pro rata rate, which the Supreme Court fully endorsed as this court did in Mirren, it was all about whether that breach and payment of damages had any effect on the property rights that were granted as part of the trademark license. So it really had nothing to do with the contract we have here, which is purely executory and simply required Ultra to pay money. And so when it breached that in bankruptcy by rejecting and everybody agrees that rejection is just a breach and you pay damages, then that ends its obligation and FERC and Rex has no obligation to perform on its end. So, you know, Mission and Penwater, which are really kind of the linchpins of FERC's attempt to come up with this newfound obligation where there's, FERC has the authority to compel specific performance even after a breach or payment of damages, simply don't stand for that proposition. And that's, again, putting aside just the binding nature of Mirrens. And I think one other, and we pointed out in our brief and I don't think there was really an effective response by FERC in its reply is it really brings up an absurdity, which is, well, if a party still has to perform under a separate independent federal obligation under FERC and FERC can compel that specific performance, then really you've got a double, a double counting problem because a party could breach and pay damages and be done with its so-called private obligations, as FERC would put it. But then under FERC's view, there's no reason why that same party wouldn't have to, you know, continue to pay the money that it already paid out by paying damages. FERC's only response is, well, you know, as long as they get to the complete filed rate, that's enough. But that's not really consistent with their theory. Their theory isn't that, you know, if you cover 75% of the payment due under the contract that there's only 25% of the federal obligation left. Their theory is that whatever happens over here with the private contract doesn't affect the federal obligation over here. And so I don't think, I think it's the logical endpoint of what they're arguing, but, you know, I don't think that, again, I think it proves too much. Judge King, you asked a question about, you know, what, how would this actually work in process, you know, how long would this take? And I think that really underscores, you know, we're happy to rest on the law, but the practical problems of FERC's suggested approach, in this particular case, I believe, I don't believe, I know, that FERC told the bankruptcy court that it could get this process done, this Mobile Sierra process done in 60 days. Well, 60 days is a lifetime in a bankruptcy case. And, but I'll give you another data point, which is that in the first energy case, where of course the Sixth Circuit agreed with this court that bankruptcy courts have authorization to reject and that the court can enjoin FERC from compelling specific performance, it did say, in a sort of throwaway line at the end of its decision, you know, talk about dicta, that FERC would have to undertake the public interest standard, rather than this court's approach, where it invited FERC to be part of the bankruptcy proceeding. And in that case, after the Sixth Circuit made its decision, FERC issued an order establishing the Mobile Sierra briefing process, et cetera, and it gave the parties 75 days to do just the briefing on this. And, you know, and I believe the opening brief by Merentz, you know, it was like 400 pages long, because it's. The problem here is that anyone who's ever had any experience in bankruptcy court is that that whole time frame, threatened time frame, you know, which is what the bankruptcy judge worries about, just doesn't work in a bankruptcy case. So that doesn't work. You're absolutely right, Judge King, and that 75 days, that was just for briefing. Yeah. I mean, put aside the time for the decision, rehearing, decision on rehearing, which is essentially required in FERC cases. It's not like FERC gets to put a one-line order down. They have to provide a reasoned decision. So that's a 6 to 12-month process, and there's no way that all of the stakeholders in any bankruptcy case, but certainly high-value cases where jobs are on the line, and the value of companies is on the line, can just sort of pause for 6 to 12 months waiting for this. That whole problem is really at the roots of this case. As you come into the bankruptcy court, FERC does and says, well, don't worry. We'll go ahead, and we'll proceed timely on this, and the answer is, timely for FERC doesn't work in a bankruptcy court. Well, that's absolutely right. And I think that's what this court recognized in Merent. That's why it came up with what I think is a pretty elegant solution to the issue, and it worked here. I mean, FERC came in. It got to examine witnesses. It got to make argument. I mean, it, at FERC's counsel, got to ask the president of Rex, you know, is there going to be any impact on consumers or on other providers, et cetera, if this contract is rejected, and the president said no. So I, you know, I think that's a pretty good indication that, you know, the process that this court laid out in Merent works pretty well. And I think my, I heard my friend say in the, in the ANR case that FERC got it all done within 35 days. I'm familiar with that case, and there's a lot of problems with trying to get all that done in 35 days. I think it's, you know, for one thing, it's putting a tremendous thumb on the scale towards not finding the public interest satisfied. It's already, as FERC calls it, a demanding and stringent standard. And if you're going to try to do it all in 35 days with no live testimony, it was on a paper hearing, even the first energy one in 75 days was on a paper hearing. So you're already kind of cutting back on the rights of the ultras of the world to be able to present their case and to say, you know, well, don't worry. We can do it in 35, we can do it in 10 days. I think you're just encouraging, you know, sort of an inevitable result that, that FERC is going to, you know, determine that the stringent mobile Sierra standard is not satisfied. But then you have a problem even further, which is, okay, I guess that goes back to the bankruptcy court, but what if ultra or whoever wants to appeal that FERC decision, well, that's got to go to the DC circuit or maybe this circuit. Meanwhile, there's a bankruptcy case going on and, and as has happened, it's happened in the Gulf Court case, which I think this court is scheduled to hear in about two months, was one of these FERC orders. And what happened there was the, the parties on the other side said, well, you know, FERC's, FERC's findings are accorded preclusive effect in, in this court and in the bankruptcy, in the Article III courts. So you've got a really big mess, even aside from the timing issues. And so, again, just as I see my time is up, so just to bring it all back, I think that's exactly why this court in Merritt came up with a very elegant solution that is grounded in law, contrary to FERC's arguments today. And that, you know, was clearly a holding across the board as FERC has repeatedly admitted without qualification. Thank you, counsel. Thank you. Rebuttal. Your Honors, I, a couple of, of points, but I think I'll start by distinguishing, there's sort of two different processes that have been discussed today. One is how the commission believes tariffs should be handled, which is by following the procedures specified in Sections 4 and 5 of the Natural Gas Act for modifying those obligations. And under that procedure, the tariff remains in force until modified. The separate, the separate procedure, which Ultra's counsel just mentioned, is the, sort of the alternative procedure that Merritt suggested might be an alternative, which is that assuming a bankruptcy court gets to relieve a debtor of tariff obligations, what should be the commission's role? And I think I'll start with that second process before turning to the first. So under that second process, assuming that a bankruptcy court has authority to relieve a debtor of regulatory obligations, Merritt makes clear that the commission should be an integral part of that proceeding. In the final sentence, it expressed an expectation that the commission would be involved in assisting the bankruptcy court in balancing the equities. And I think that reflects that when you're dealing with matters subject to the commission's jurisdiction, transmission of electricity, transportation of natural gas, those are affected with an important public interest because they affect consumers, other parties, just the availability of energy. And so it is important in that case to allow the commission to bring its expertise to bear, which it can only do by conducting. As you well know, is that the bankruptcy court just said, there's going to be delay, delay, delay. And you tell a bankruptcy court that, and their answer is that is money and that is nothing but trouble. And the problem FERC had in the bankruptcy court here is that the court just didn't credit that this could be done on a timely basis. And you know, frankly, you can't blame them. I mean. Your Honor, I don't, I have a slightly different reading of the bankruptcy court's order, which is that the bankruptcy court said Merritt would not allow to conduct, FERC to conduct proceedings, no matter how quickly they could happen. And I think that is contrary to the expectation that Merritt suggested that FERC would be involved and the recent decision in First Energy. That's a decision by two former bankruptcy judges. And they saw no tension between the idea of the commission conducting the proceedings, it must conduct by statute to offer its views on the public interest and the, you know, the needs of the bankruptcy process. In here, there was just no, there wasn't even an opportunity given for the commission to look at the evidence, make a decision as to whether, you know, this would be in the public interest, contrary to it, and offer its expertise to the bankruptcy court. And the problem was you just couldn't persuade the bankruptcy judge that that could be done on a timely basis. He just didn't buy it. Your Honour, I don't believe that, I think, on, sorry, Your Honour, I think at page, at ROA 560 and 561, the bankruptcy court made clear it wasn't a matter of timing, but it just didn't believe it would be consistent with Merritt for the commission to conduct proceedings, no matter how quickly they could be done. And I think, you know, that is a problem, given that the commission is the body Congress charged with protecting the public interest inherent in natural gas transportation. And First Energy recognized that. But I think, you know, but I think this sort of brings us back to the larger problem, which is having bankruptcy courts decide whether parties should be relieved of the regulatory obligation tariffs create. The reason that Congress set up the Natural Gas Act that created this very, you know, strict structure of parties must follow tariffs until modified is that it recognized there is an immense public interest that lurks behind this, that modifying tariffs can have knock-on impacts for other pipelines, consumers, and other parties. And I think outside of, ULTRA tries to suggest that outside of bankruptcy, the commission just can't enforce tariffs. That's not true. Section 20 of the Natural Gas Act expressly gives the commission enforcement authority. And as, you know, and the other provision, ULTRA mentions Section 7, just addresses a different matter. The page, the case cited at page 11 of her reply made clear that tariffs bind shippers and pipelines alike. Thank you, Your Honor. Thank you, counsel. The court will take this matter on.